# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-09-00141-CV

**Shawna Loehr, Appellant**

**v.**

**Texas Department of Family & Protective Services, Appellee**

### FROM THE COUNTY COURT AT LAW OF BASTROP COUNTY
### NO. 08-12,319, HONORABLE BENTON ESKEW, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

Shawna Loehr appeals from a final order following a jury verdict terminating her parental rights to three children. In a single issue on appeal, Loehr asserts that the trial court abused its discretion in admitting evidence that Loehr, as a child, had been both a victim and a perpetrator of sexual abuse.[1] Finding any error in the admission of the evidence harmless, we will affirm the termination order.

---

[1] Following the entry of the termination order, Loehr timely filed a statement of points for appeal. *See* Tex. Fam. Code Ann. § 263.405(b)(2) (West 2008). The trial court found that each of Loehr's points for appeal was frivolous. This Court concluded, however, that the issue Loehr now presents on appeal is not frivolous; i.e., based on the record then before us, the complaint had an arguable basis in law and fact. *See Loehr v. Texas Dep't of Family & Protective Servs.*, No. 03-09-00142-CV, 2009 Tex. App. LEXIS 5693, at *12 (Tex. App.—Austin July 22, 2009, no pet.) (mem. op.). As we emphasized, our decision was not a final determination of the merits of that issue. *See id*. at *13.

## BACKGROUND

Loehr has three children who are the subject of this suit: D.L., a boy born March 1, 2002; L.H., a girl born January 26, 2004; and D.T., a boy born January 1, 2005. During the termination trial, the jury heard evidence that Loehr's involvement with the Department began in 2002, when Child Protective Services (CPS) investigated Loehr for neglectful supervision of D.L. During this investigation, Loehr admitted to smoking marihuana. Loehr signed a voluntary safety plan and placed D.L. with her mother and stepfather. Loehr later regained custody after testing negative for drugs.

Loehr testified that in 2003 she was unemployed, living with a friend named Roxanne Kuiken, and dating Christopher Washburn. Washburn, Loehr indicated, was the biological father of both L.H. and D.T. When L.H. was born the following January, the infant tested positive for marihuana. Loehr admitted that she had "once" smoked marihuana—mixed with her best friend's ashes—while pregnant with L.H. After a clean drug test, however, Loehr was able to maintain custody of her children.

Between the summer of 2004 through May 2005, Loehr and Washburn were subject to a court-ordered service plan, including random drug screening and parenting classes. They were also ordered to obtain and maintain stable housing and employment. In January 2005, around the time D.T. was born, the plan was amended to require Loehr and Washburn to live with Washburn's mother "until [Loehr] can locate other appropriate housing for the family." Loehr testified that she and Washburn lived with his mother for "a couple of months" until his mother "kind of kicked us

2

out." The couple then moved in briefly with a friend of Washburn's whom Loehr called "Pops." In May 2005, the Department closed its case against Loehr.

In July 2005, Loehr and Washburn moved in with Laverne Cooper, a friend of Washburn's family. As we explain in more detail below, a key issue during the trial was the safety and suitability of Cooper's house for the children. There was evidence that Cooper had a history of allowing drug and alcohol abusers to live on her property. Also, Cooper owned an outdoor swimming pool that Loehr's children were able to enter. In September 2005, L.H. nearly drowned in the pool while Loehr was sleeping. According to Loehr, D.L. awakened her early one morning and told her that L.H. had fallen into the pool. Loehr and Larry Tompkins, one of Cooper's adult sons, rushed outside to rescue her. Tompkins performed CPR on L.H. and was able to resuscitate her. L.H. was then taken to the emergency room and was hospitalized for approximately one week. Other incidents at Cooper's house included D.T. either falling or being pushed down the stairs and sustaining a skull fracture, one of the children gaining access to rat poison that was kept in the kitchen cabinet, and an alleged incident of sexual abuse against D.L. perpetrated by C.R., Cooper's grandson.

Loehr testified that by November 2007, she was working at a local Dairy Queen and living in a trailer home on Cooper's property. The children were still living in Cooper's house. Other adults were also living in the trailer, including Tompkins.[2]

---

[2] Washburn testified that he and Loehr had ended their relationship approximately two years earlier and that he was no longer living on the property. Loehr denied any romantic involvement with Tompkins.

3

In December 2007, Loehr explained, she began performing secretarial work for Tompkins in Houston while her children remained with Cooper. Loehr would, however, "come home on the weekends." At the same time, Loehr was also renting a home in Buffalo, Texas that Tompkins had leased and signed over to her. Sometime around Christmas, while Loehr was staying at Cooper's house with her children, Cooper drove to Houston and checked herself into a psychiatric hospital.

In January 2008, the Department filed a petition for termination of Loehr's parental rights and removed the children from Loehr's custody. In its petition, the Department alleged that Loehr, among other things, had engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children, failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the children, and used a controlled substance in a manner that endangered the health or safety of the children.[3]

A hearing was held on January 29, 2008. *See* Tex. Fam. Code Ann. § 262.201 (West 2008). Following the hearing, the trial court signed temporary orders[4] requiring Loehr to complete a psychological evaluation, attend counseling and parenting classes, and submit to random drug testing within eight hours of the Department's request. The orders further provided that "any failure to [submit to random drug testing] will be reported to the Court as a dirty test" and that the

[3] In the same proceeding, the Department also sought and obtained the termination of the parental rights of the alleged fathers of the children—Daniel Sorrells, the alleged father of D.L., and Washburn, the alleged father of L.H. and D.T. Because neither Washburn or Sorrells have appealed from the termination order, we do not discuss the allegations and evidence specific to them.

[4] The temporary orders were admitted into evidence as Petitioner's Exhibit 1.

results of such tests "will be considered in assessing [Loehr's] suitability for permanent placement of the children." The orders advised Loehr that "failure to fully comply with these orders may result in the restriction or termination of parental rights."

In addition to the temporary orders, a family service plan, which Loehr admitted signing, was filed.[5]  In the service plan, Loehr agreed to, among other terms, refrain from use of drugs and alcohol.  However, Loehr testified that after the plan was filed, she tested positive for marihuana "once" and missed several other drug tests because she "wasn't able to make it" to the testing location.  Pursuant to the temporary orders, these missed tests were also reported as positive tests.[6]

During her testimony, Loehr attempted to minimize the extent of her drug use.  However, she admitted that she had used marihuana to calm herself.  Also, while denying that she had smoked marihuana around the children, she acknowledged that "I messed up one time" while pregnant.  The Department then elicited the following testimony:

> Q:    It was part of your service plan to take an OSAR [Outreach, Screening, and Referral] Evaluation to see if you indeed had a recurring drug problem.
>
> A:    I didn't feel I did.  I moved away from everything and locked myself in my house.  That was my rehab.
>
> Q:    You would have been offered free drug treatment had you taken the OSAR; are you aware of that?

---

[5]  The family service plan was admitted into evidence.

[6]  The test in which Loehr actually tested positive occurred on July 1, 2008.  Loehr admitted that the reason the Department was able to get her to submit to a drug test that day was because she had been required to appear in court for a hearing that day and was tested at the hearing.

A:     I didn't feel that I needed it.  I can do it on my own.

Q:     You failed to sign up for the counseling as well, right?

A:     I guess.

Q:     It was Dr. McNeil, in the psychological of '04, where you said you smoked marihuana to keep food down; do you recall that?

A:     No, I don't remember.

. . . .

Q:     When you took your psychological evaluation—this is the first one with Dr. McNeil in '04.

A:     Okay.

Q:     —you denied having a drug problem and said you could quit any time; is that true?

A:     Yes.

Q:     You could quit now.

A:     I have.

Q:     You've been testing positive pretty regularly since 2002.  And you've been motivated for several motivators, including being pregnant, to not smoke marihuana.  Because you've been—yet you claim you can quit at any time.

A:     Yes.

Q:     You just don't want to.

A:     That's not true.

Loehr admitted, however, that she has continued to use marihuana "on and off" throughout her children's lives.  When asked if she had ever "blown smoke in her daughter's face," Loehr testified,

6

Never in my life would I ever do that to my children. I've never smoked around my kids. I've never even come home when I've been smoking. I don't come home until the next morning. That's why they stay with Laverne [Cooper]. It's just like everybody going out and having beer, I just don't drink.

The Department also elicited the following testimony from Loehr about her drug use while pregnant:

Q:      Shawna, do you think that [L.H.] was harmed when she was in your stomach, in your womb, when you were using marihuana? Do you think that harmed her?

A:      No.

Q:      You don't? Nothing wrong with that?

A:      I didn't say there wasn't nothing wrong with it.

Q:      You don't think it harmed her?

A:      I messed up.

Q:      I'm asking you if you think it harmed your child?

A:      She came out fine. They ran all the tests on her and everything, she was perfect.

Dr. Matthew Ferrera, a licensed psychologist who had interviewed Loehr in 2005, testified that Loehr told him that "she had a problem with marihuana smoking, you know, one to two joints a day, smoking while she was pregnant so it was obvious she needed [substance abuse treatment]." In response to a hypothetical question, Ferrera opined that if someone failed to get

substance abuse treatment, that person "will continue to most likely make the same mistakes that they have been making up to that point in time."[7]

When asked directly if she thought she had a drug problem, Loehr testified, "No, I don't." When asked when the last time was that she used marihuana, she testified, "Two months ago, three months ago. A long time." When asked why she had not done counseling as ordered by the court, Loehr testified, "I didn't think I needed it. I'd done it before."

The jury also heard evidence about Loehr's criminal history. In May 1999, Loehr was convicted of theft, specifically stealing household items and clothing valued at more than $500.00 but less than $1,500. Loehr also admitted that in January 2008, after this case had been filed, she had possessed "one joint" of marihuana, which resulted in her being placed on deferred adjudication.[8] As part of her deferred adjudication, Loehr had agreed to provide a negative urinalysis by April 7, 2008. However, she admitted that, as of the termination trial in late October 2008, she had not done so.

Loehr was also required as part of the service plan to provide proof of employment to her caseworker. She admitted that in the 10 months since the case had been filed, she had not done so. Nor had she received court-ordered vocational training. However, Loehr claimed that she took home approximately $400 every two weeks from the secretarial work she did for Tompkins, although she provided no documentation to verify this.

---

[7] As we explain in more detail below, Dr. Ferrera also testified about Loehr's history of sexual abuse and her need for counseling and treatment in that regard.

[8] Loehr also admitted to possessing on one occasion another controlled substance, Xanax.

The court had also ordered Loehr to maintain stable housing. However, Loehr admitted that in the 10 months since the case had been filed, she had resided in the Bryan/College Station area, at Cooper's house near Smithville, and in the rental house in Buffalo. The court had further ordered that when Loehr visited the children, no one other than Loehr, Cooper, Washburn, or Washburn's mother was to have access to the children. However, Loehr admitted that Tompkins had access to the children on at least one such visit in violation of the court order.

There was also evidence presented that D.L. had missed 19 days of school one semester and had been tardy on 12 occasions. Loehr testified that she was unaware that many of D.L.'s absences were not excused. She explained, "I was working. That's when I was out of town and the kids were with Laverne [Cooper]." When asked if she believed leaving her children with Cooper endangered their emotional health or physical well-being, Loehr testified, "No, because she would never hurt them, and they love her." Loehr also did not believe that the other people who lived on Cooper's property would hurt the children.

Cooper, who had intervened in the suit and sought conservatorship of the children, also testified at trial. Cooper denied that she had allowed people to live in her house who had drug problems, although she acknowledged that people who she assumed were drug users lived "on the property" and "in the guest house."[9] Two of the people who allegedly used drugs on Cooper's

---

[9] Cooper owns rural acreage located off of Zapalac Road in Smithville. Cooper testified that she owns a house and three acres while her brother owns seven acres adjoining hers, although Robyn Gobbel, a social worker who performed a home study on Cooper, testified that Cooper's brother "resides on two of [Cooper's] seven acres." At any rate, it is undisputed that there are multiple residential structures on Cooper's portion of the property, including Cooper's house, trailer homes, and a pool house.

9

property were Cooper's son, Narlen Tompkins, and Cooper's teenage grandson, R.R. Cooper believed that Narlen used marihuana and that R.R. had, on one occasion, purchased cocaine. However, Cooper dismissed R.R. as a "wannabe" and did not believe that he had actually consumed the cocaine.

Cooper acknowledged that during a prior hearing in this case, she had testified that she had sought for at least a year to get the drug users off of her property but that she did not have the "physical strength" to force them to leave. However, on January 14, 2008, the Department, as part of its action against Loehr, sought and obtained from the trial court a temporary injunction prohibiting anyone but Cooper from residing on her property. In its temporary orders following the adversary hearing, the trial court ordered that the temporary injunction would remain in effect during the pendency of this case. Cooper testified that, because she had been unable to get the drug users off of her property herself, she considered the injunction to be "the best thing that ever happened to me."

Robyn Gobbel, a social worker who had completed the home study on Cooper, testified about her findings. According to Gobbel, Cooper had told her that "there had been a substantial amount of violence on the property" and that there were "pages of domestic violence calls that had been made to the property." Cooper also described to Gobbel "a lot of violent activities" directed at the property, including a window in Cooper's home being broken out and Cooper's truck being "hit to the point that it wasn't in operating condition." Gobbel testified that Cooper attributed this violence to "the fact that [Cooper] had asked all these people to leave her property when she pursued a Court Order."

10

Gobbel also testified about a wrecking yard adjacent to Cooper's property where Cooper's brother resided. Cooper told Gobbel that there were people "coming and going" from the wrecking yard "on a very regular basis" whom Cooper characterized as "low class." Gobbel explained:

> She specifically talked about prescription pill drug abuse. She said that people were coming and going on a very regular basis, people would come, and then her brother would get upset with them for not helping with the utilities, he'd kick them out, and they'd come back at a later time. So a lot of instability as far as who is around and the types of behaviors and things.

However, according to Gobbel, Cooper "seemed to feel that her five acres of land was enough space to keep her separated from the activities that were going on off of her five acres of land, her portion of it." Gobbel expressed concerns about the history of the property and the fact that Cooper had not been able to remove the drug users from the property until the trial court had ordered her to do so.

Additionally, photographs of the house from the CPS investigation were admitted into evidence, and they showed such things as dirty and unkempt rooms, a pair of scissors and trash on the floor, and an open pocket knife on an end table. Cooper acknowledged that the house looked "pretty bad" when the pictures were taken. However, Gobbel testified that, at the time she had visited the home, it was "in excellent condition, aside from some minor repairs that she was working on."

Photographs were also admitted of the outdoor swimming pool and an open gate leading to the pool. Cooper acknowledged that, as of January 2008, the pool remained accessible to the children. Cooper explained, "That gate was locked many times but we had a lot of traffic,

11

[people] moving out, and going from my house over to the guest house because there's a sidewalk going by the pool. So when [people] would come through there, they would unlock and leave it." However, by the time of the termination trial in October 2008, Gobbel testified that the issue with the pool had been resolved and it was no longer accessible to the children. However, her concern "was the length of time it had taken [Cooper] to resolve it."

Cooper also testified about the circumstances surrounding her hospital stay. Cooper explained that she was "angry" with the people on her property who were using drugs and alcohol, and she needed a break from dealing with them. She drove to Houston and, after driving her car off of the road (which she claimed was unintentional), checked herself in to a hospital. She informed the hospital staff that she had thought about killing herself, and they treated her for depression.[10] She stayed in the hospital for four days. During this time, Cooper testified, the children were at her house under the supervision of Loehr, Cooper's sons Larry and Narlen Tompkins, and Narlen's wife, Elizabeth. Cooper admitted that Elizabeth had mental problems (in Cooper's words, she was "slow" and needed "therapy") and Narlen had an alcohol problem and prior convictions for DWI, evading arrest, and felony aggravated assault. There was also evidence presented that Larry, like his brother, was an alcoholic. We have already summarized Loehr's history of drug use. Despite knowing about the problems of these people, Cooper testified that she did not worry about them supervising the children while she was away because "they were not drinking during the holidays." When asked

---

[10] Later during her testimony, Cooper testified that she did not actually have suicidal thoughts and that she had lied to the hospital staff so that they would admit her and treat her for her diabetes.

12

how she could have known this since she was in Houston at the time, Cooper testified, "Because I know. They had their children."

There was also evidence presented about the emotional and physical condition of the children after they were removed from Loehr's custody. Kathy Sparks, the foster parent for the children, testified about the children's condition and behavior when they were first brought into her care. Sparks testified that D.L. and L.H. needed extensive dental work—D.L. "had very bad cavities" and "had to have several fillings" while L.H. needed "extensive, cavity dental work done as well." Also, D.L. "had very aggressive behavior. He didn't interact very well with his younger siblings. He didn't respect adults." Additionally, according to Sparks, D.L. "has sexually acted out with [L.H.]," while L.H. was "just kind of all over men" and exhibited inappropriate sexual behavior.

Michael Greenwood, the children's therapist, testified that the children needed constant attention and redirection and had difficulty getting along with each other. Greenwood also testified that none of the children expressed a desire to be with their mother, although he acknowledged that in one of his past therapy progress reports, he had written that "[D.T.] has made no further mention of having had visits with his mother and mentioned in one session that he was sad because he missed her."

Stefenie White, an adoption unit supervisor for CPS, testified that she believed the children were likely to be adopted based on their age, their behavior, and their ability to maintain the same foster home since they first came into foster care in January 2008. White acknowledged that whenever parental rights are terminated, it is a traumatic experience for the children. It was her understanding, however, that in this case, "the children have not been asking for their parents."

13

Other evidence considered by the jury included the testimony of Nicole Dye, the conservatorship caseworker in this case. Dye summarized Loehr's history of positive drug tests since the case had been filed:

> On April 22, 2008, she was called in for a random drug test. She did not show, and admitted over the telephone that it would be positive. . . . So that was regarded as a dirty test. On May 22, 2008 she was called in for a random drug test, and she did not show. That was also a dirty test. On May 28, 2008 she was called in and did not show. That was a positive test. On June 4, 2008 she was called in and did not show. That is regarded as a dirty test. The next day she did show after the eight hour requirement, that test came back negative. On July 1 she was given an oral drug test and it was positive for marihuana and one or more other substances, which means that on the oral test there was not enough saliva to detect the other drugs but it was positive for more than one substance. . . . On August 5, 2008 she was called in for a random drug test and she did not show so that was a positive test.

Dye also testified that Loehr had never contacted her to set up individual counseling. Dye acknowledged that Loehr did submit to a psychological evaluation. However, Dye added that Loehr had been ordered to follow all recommendations from that evaluation, including "to enter an inpatient alcohol and drug treatment program, carefully work the 12 steps, maintain conscientious sobriety during after care and participate in long term individual and group psychotherapy." According to Dye, Loehr had not done any of those things. Additionally, Dye testified that Loehr had not provided the Department with any proof of her income as she had been required to do and that Loehr had failed to maintain stable living arrangements since the case had been filed.

Dye summarized the Department's concerns about Loehr—her substance abuse issues with marihuana and lack of treatment; the safety conditions at Cooper's house, including the drug use, violence, and crime that had occurred on the property; and Loehr's failure to comply with court-

14

ordered services. Dye opined that terminating Loehr's parental rights and allowing the children to be adopted were in the children's best interest, and that returning the children to their parents or Cooper was not.

The final witness to testify for the Department was Joan Martin-Thurman, the executive director of the local Court Appointed Special Advocates (CASA), the guardian ad litem for the children. Ms. Martin-Thurman opined:

> The best interests of these children is to keep all three together, terminate the parental rights, not return them to Mrs. Cooper . . . and to put these children into adoption where they have an opportunity to flourish and grow and have a stable family. They don't know what a stable family is at this point.

Martin-Thurman added, "[W]e fight for reunification when possible but it's not possible in this case. We're going to end up with a child who is either seriously hurt or dead." Adoption of the children was, in her view, "the only good alternative for these children."

Martin-Thurman also testified that when CASA had first started working with Loehr, she had hoped that reunification would be possible. When asked if she saw anything in Loehr that gave her a reason for optimism, she testified, "I did but her time ran out. We only have a certain amount of time to keep children in limbo. It is now time for the children to move on. She didn't—she would not or could not give up her lifestyle for the benefit of these children." Loehr, according to Martin-Thurman, had not contacted CASA, was not working her service plan, and was not making an attempt to change her lifestyle. She concluded, "I never stopped hoping for Ms. Loehr but she didn't give me a lot to work with."

15

At the close of evidence, the jury was instructed that for Loehr's parental rights to be terminated, it must find by clear and convincing evidence that the Department proved at least one of the following grounds for termination: (1) Loehr knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children; (2) Loehr engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children; (3) Loehr constructively abandoned the children for not less than six months; (4) Loehr failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the children; or (5) Loehr used a controlled substance in a manner that endangered the health or safety of the children and failed to complete a court-ordered substance abuse treatment program. Additionally, the jury needed to find by clear and convincing evidence that termination of the parent-child relationship would be in the best interest of the children.

The jury found by clear and convincing evidence that Loehr's parental rights should be terminated. The jury also found that the Department should be appointed the sole managing conservator of the children. The trial court rendered a final order terminating Loehr's parental rights and naming the Department sole managing conservator. This appeal followed.[11]

---

[11] Cooper, who had intervened in the termination suit, also filed a notice of appeal from the trial court's order. However, she later filed a motion to dismiss herself from the appeal, which this Court granted.

## DISCUSSION

Loehr brings a single issue on appeal asserting that the trial court abused its discretion in admitting evidence that Loehr had been both a victim and perpetrator of child sexual abuse approximately twenty years before trial. This evidence was first admitted during the Department's direct examination of Loehr:

Q:      You admitted to CPS that you sexually abused your brother [R.L.]; is that correct?

A:      Yes.

Immediately thereafter, Loehr's trial counsel objected on the basis of relevance, explaining, "The removal in this case was not about sexual abuse." The trial court responded, "One of the ultimate issues will be best interests of the child, and I will overrule the objection." The Department then continued:

Q:      You're seven-and-a-half years older than your brother [R.L.]; is that correct?

A:      Oh, I guess. I don't know.

Q:      Now, at the time of this investigation in '02 you admitted that you smoked marihuana and you tested positive for that; is that correct?

A:      Yes.

Q:      So when did the sexual abuse occur? How old were you?

A:      Which sexual abuse?

Q:      Of your brother [R.L.]

A:      Eight, nine.

17

Q:      He made an outcry about that when he was 15, didn't he?

A:      No. The only reason he did that is because my dad told him everything that happened so my brother would hate me.

Q:      You don't know that, do you?

A:      Yes, I do.

Q:      Isn't it true that you only made the allegation about your stepfather after you confessed to abusing your brother?

A:      Nope. My mother knew years ago, and I'll take a lie detector test to prove it.


The Department then moved on to another line of questioning.

The Department then returned to the subject during the testimony of Dr. Matthew Ferrera, the licensed psychologist who had interviewed Loehr in 2005. This time, however, Loehr's trial counsel did not object to the admission of the evidence:


Q:      What did [Loehr] tell you about the sexual abuse that she engaged in?

A:      What she stated, she said she was abused at six or seven. She said when she was eight or pretty close in time, she said that her mother discovered that she was sexually abusing her two-year-old brother. She really had difficulty talking about that. So I—you know, I tried to press for details but it was pretty disturbing to her and upsetting so I kind of backed off, just—I felt like that information was useful, too, even if I didn't get other facts.

. . . .

Q:      What conclusions were you able to draw regarding what kind of risk she presented?

A:      You know, I—I thought she was a low risk for future sexual offenses. You know, I thought if she was ever to do any sexual acting out with a child, that it would probably be because of who she was with. A lot of times adult women who sexually abuse children don't do it by themselves, they're with

18

a man who really wants to do it, and the woman has relationship issues. And so she won't break off the relationship, she's too dependent on the man so she either supports the sexual abuse or participates in it. So—I said she might be at risk for that. But, you know, even still, the risk would be low.

Q:      How does an experience of being an abuser—does that have any effect on parenting ability or future skills or future activity in life?

A:      The correct answer is it depends. I mean, does being abused have an effect on your ability to be a parent, the correct answer is it depends. If the person can come to grips with the abuse and handle it in some way and be in charge of the abuse, then that person can be a parent, a good parent too.

        If, on the other hand, a person who's abused never comes to grips with it, never deals with it, either it's too powerful for them and they've never sought out help for it, in that case the abuse controls them and it can have a wide range of negative impacts on parenting.

Q:      I may be naive for separating the two but I would ask the same question about the experience of being the abuser. . . . And that's really the question. Is the extent of dealing with it a big factor in how effective—how much it affects you later?

A:      Absolutely. Once again, the event itself has to interact with who the person is. And if the person—it comes down to this. If the person can dominate the event, then they don't suffer the negative effects from whatever the trauma is. On the other hand, if it dominates them, it tells them what to do.

Loehr argues that the above evidence is not relevant because the alleged abuse occurred almost two decades before the events in this case and because the Department did not allege that Loehr had committed any sexual abuse against the children.[12] The Department responds that

---

[12] Loehr also claims on appeal that the "prejudicial impact" of the evidence "far outweighed any probative value." However, as the Department correctly observes, Loehr's objection at trial was limited to relevance. Therefore, Loehr waived any rule 403 objection. *See* Tex. R. App. P. 33.1(a).

19

the evidence was relevant to the jury's "best interest" determination and, moreover, that any error in the admission of the evidence was harmless.

Assuming without deciding that the evidence that Loehr had been a victim and perpetrator of sexual abuse as a child was not relevant and should have been excluded, we cannot conclude on this record that Loehr was harmed by its admission. We will not reverse a judgment based on an improper evidentiary ruling unless the error "probably resulted in an improper judgment." *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995); *Beard Family P'ship v. Commercial Indem. Ins. Co.*, 116 S.W.3d 839, 849 (Tex. App.—Austin 2003, no pet.); *see* Tex. R. App. P. 44.1(1). To prevail on appeal, the complaining party must demonstrate that "the judgment turns on the particular evidence excluded or admitted." *Alvarado*, 897 S.W.2d at 753-54 (Tex. 1995). Having reviewed the entire record, we conclude that Loehr has not met this burden.

Under the jury charge, in order to terminate Loehr's parental rights, the Department was required to prove by clear and convincing evidence (1) at least one of the five submitted statutory termination grounds; and (2) that it was in the children's best interest to terminate the parent-child relationship. *See* Tex. Fam. Code Ann. § 161.001 (West Supp. 2009); *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

Loehr has not demonstrated that the jury's finding on the statutory grounds for termination turned on the evidence of sexual abuse. The jury heard extensive evidence about Loehr's drug use. Loehr admitted that she had used marihuana not just in the past, but also while this case was ongoing. In fact, one such incident shortly after the case was filed resulted in her being placed on deferred adjudication for possession of a controlled substance. Moreover, Loehr

20

repeatedly tested positive for marihuana, once directly, and on several occasions indirectly by failing to take the court-ordered random drug tests. Additionally, Loehr admitted that she had failed to complete a court-ordered substance abuse treatment program. This and other evidence, summarized above, would support the jury's finding on the fifth termination ground—use of a controlled substance—and the second termination ground—engaging in conduct or knowingly placing the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children. *See In re T.N.S.*, 230 S.W.3d 434, 439 (Tex. App.—San Antonio 2007, no pet.) (history of drug addiction may establish endangering course of conduct, even if parent is drug-free at time of trial).

The jury also heard considerable evidence about Loehr's failure to follow the trial court's orders. The temporary orders and the service plan required Loehr to do several things, including maintain a drug-free lifestyle, submit to random drug tests, provide the Department with proof of income, maintain stable living arrangements, set up individual counseling, and follow all of the recommendations from her psychological evaluation. According to Nicole Dye, the conservatorship caseworker, Loehr failed to do any of the above, and Loehr even admitted to many of these failures. This evidence would support the jury's finding on the fourth termination ground. *See* Tex. Fam. Code Ann. § 161.001(1)(O).

Finally, the jury heard extensive evidence about the drug use, crime, and violence that occurred on Cooper's property, the place where Loehr had allowed the children to live. Cooper testified about the people on the property who abused drugs and alcohol, including members of her own family, and the difficulty she had in removing them from the property. Moreover, when she was

21

finally able to remove them from the property because of the temporary injunction, there were incidents of violent retaliation directed at the property. Also, according to Gobbel, Cooper had told her that "there had been a substantial amount of violence on the property" and there were also "pages of domestic violence calls that had been made to the property." Furthermore, Gobbel testified that Cooper's property was adjacent to a wrecking yard that was frequented by drug users who abused prescription drugs. The undisputed evidence at trial showed that Loehr had allowed her children to live in this environment for years. This and other evidence would support the jury's finding on the first termination ground, that Loehr knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children. *See id*. § 161.001(1)(D).

Nor has Loehr demonstrated that the jury's "best interest" finding turned on the evidence of sexual abuse. In addition to the above evidence bearing upon Loehr's capacities as a parent, Dye opined that it was in the children's best interest that Loehr's parental rights be terminated given Loehr's substance abuse, her failure to comply with the court-ordered service plan, and the conditions at Cooper's home. Dye did not cite Loehr's history of sexual abuse as a factor. In fact, when asked directly if sexual abuse "had any bearing on this investigation," Dye testified, "No." Joan Martin-Thurman, the CASA executive director, similarly did not mention sexual abuse when testifying about the best interest of the children. Rather, Martin-Thurman testified that it was important for the children to have "a stable family," and that, if Loehr's parental rights were not terminated, "We're going to end up with a child who is either seriously hurt or dead." The critical factor for Martin-Thurman was Loehr's lifestyle: "She didn't—she would not or could not

22

give up her lifestyle for the benefit of these children." There was also evidence presented that Loehr was negligent in her supervision of the children, that the children did not express a desire to be returned to their mother, and that they were likely be adopted if Loehr's parental rights were terminated.

The record does not reflect that the jury's findings regarding either the statutory grounds for termination or the "best interest" determination turned on the evidence of Loehr's history of sexual abuse as a child. Because Loehr has failed to demonstrate that the trial court's order terminating her parental rights turned on this evidence, we cannot conclude that she was harmed by its admission.

We also observe that, although trial counsel for Loehr objected to Loehr's testimony about sexual abuse, he did not object to similar testimony from Dr. Ferrera. It is well settled that error in the admission of evidence is deemed harmless and is waived if the objecting party subsequently permits the same or similar evidence to be introduced without objection. *See Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004); *Richardson v. Green*, 677 S.W.2d 497, 501 (Tex. 1984).

We overrule Loehr's sole issue on appeal.

## CONCLUSION

We affirm the order of termination.

_____

Bob Pemberton, Justice

Before Justices Patterson, Puryear and Pemberton

Affirmed

Filed:   December 17, 2009